1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    PACIFIC MARITIME ASSOCIATION,          Case No. 13-cv-04887-WHO

              Plaintiff,
8
                                            **ORDER DENYING MOTION FOR**
9         v.                                **CONTEMPT**

10   INTERNATIONAL LONGSHORE AND             Re:  Dkt. No. 15
     WAREHOUSE UNION, LOCAL 10, et al.,
11            Defendants.

12

13                             **INTRODUCTION**

14        Plaintiff Pacific Maritime Association ("PMA") moves for a finding of civil contempt,

15   issuance of a fine, and issuance of a prospective fine against defendants International Longshore

16   and Warehouse Union, Local 10 ("Local 10") and International Longshore and Warehouse Union,

17   Local 34 ("Local 34") for purportedly violating the Court's Order confirming and enforcing the

18   parties' stipulation to be bound by the Joint Coast Labor Relations Committee's Meeting No. 22-

19   13 minutes.  PMA argues that the defendants violated the Order because fewer workers than

20   ordered by employers arrived for work on November 27, 2013, when a major protest occurred at

21   the Port of Oakland.  Based on the parties' brief and argument of counsel, and for the reasons

22   below, the motion for contempt is DENIED.

23                             **BACKGROUND**

24        The following facts were presented to the Court:

25   **I.    THE PARTIES AND INDUSTRY**

26        Plaintiff Pacific Maritime Association is a multi-employer collective bargaining

27   association whose members include stevedoring companies, terminal operators, and maintenance

28   and repair contractors that employ dockworkers, such as longshoremen and marine clerks.

United States District Court
Northern District of California

Marzano Decl. ¶ 2.  PMA represents its members in collective bargaining negotiations with unions and in the administration of the resulting labor agreements.  Marzano Decl. ¶ 2.  PMA has labor agreements with the International Longshore and Warehouse Union ("ILWU").  The ILWU negotiates those agreements on behalf of Defendant ILWU Local 10, which represents San Francisco Bay Area longshoremen, and Defendant ILWU Local 34, which represents San Francisco Bay Area marine clerks, among other longshore locals.  Farley Decl. ¶ 3; Ferris Decl. ¶ 4; Marzano Decl. ¶ 2.  At the Port of Oakland, where the Locals' members work, the Oakland International Container Terminal (which is run by SSA Terminals), Ports America Outer Harbor Terminal, and Seaside Transportation Services Terminal (collectively, the "terminals") are operated by PMA members.

ILWU, on behalf of Locals 10 and 34 (as well as other locals and their employees), and PMA, on behalf of its members, entered into the Pacific Coast Longshore & Clerks' Agreement ("PCL&CA").  Farley Decl. ¶ 4; Ferris Decl. ¶ 5; Marzano Decl. ¶ 3.  The PCL&CA consists of two documents:  the Pacific Coast Longshore Contract Document 2008-2014 ("PCLCD"), which covers Local 10 longshoremen employed by PMA members in the San Francisco Bay Area, and the Pacific Coast Clerks' Contract Document 2008-2014 ("PCCCD"), which covers Local 34 marine clerks employed by PMA members in the San Francisco Bay Area.  Farley Decl. ¶ 4; Ferris Decl. ¶ 5; Marzano Decl. ¶ 3.  These agreements were in effect during the period relevant to this motion.  Marzano Decl. ¶ 3.

The provisions pertaining to no-strikes and work stoppages, as well as the grievance and arbitration procedures, in both agreements ("Agreement") are virtually identical.  Marzano Decl. ¶ 3, Exs. A & B.  The section numberings also appear identical.  Sections 11.1 of both agreements state that "[t]here shall be no strike, lockout or work stoppage for the life of this Agreement."  Marzano Decl. ¶ 4.  However, workers "shall not be required to work when in good faith they believe that to do so is to immediately endanger health and safety."  Agreement § 11.41.  Nor does it violate the Agreement to refuse "to cross a legitimate bona fide picket line," i.e., a picket line "established and maintained by a union, acting independently of the ILWU longshore locals, about the premises of an employer with whom it is engaged in a bona fide dispute over wages, hours or

United States District Court
Northern District of California

1   working conditions of employees, a majority of whom it represents as the collective bargaining

2   agency."  Agreement § 11.51.

3        Sections 17 of both agreements set out an exclusive, multi-step grievance and arbitration

4   procedure for resolving all contractual disputes between the union and the employers.  Farley

5   Decl. ¶¶ 13-14; Ferris Decl. ¶¶ 18-19; Marzano Decl. ¶ 5.  Sections 17.15 states that "no other

6   remedies shall be utilized by any person with respect to any dispute involving this Agreement until

7   the grievance procedure has been exhausted."  Farley Decl. ¶¶ 13-14; Ferris Decl. ¶¶ 18-19;

8   Marzano Decl. ¶ 5.

9        Disputes are initially heard by the Joint Port Labor Relations Committee ("JPLRC"), with

10  the union component and the employers' component each having an equal vote.  Marzano Decl.

11  ¶ 5.  The Northern California Longshore JPLRC is made up of representatives of Local 10 and

12  PMA; the Northern California Clerks JPLRC is made up of representatives of Local 34 and PMA.

13  Farley Decl. ¶ 8; Ferris Decl. ¶ 9.  If JPLRC cannot agree, the dispute is referred to the Joint Area

14  Labor Relations Committee.  If that committee cannot agree, the dispute may be referred by either

15  side to the Area Arbitrator.  Agreement §§ 17.22-17.25.  The Northern California Area Arbitrator

16  is Terry N. Lane; the Relief Arbitrator is Joseph Lucas, who hears disputes when Lane is

17  unavailable.  Farley Decl. ¶ 15; Ferris Decl. ¶ 20.  Sections 17.52 state that the arbitrator has

18  "jurisdiction to decide any and all disputes arising under the Agreement including cases dealing

19  with the resumption or continuation of work."  Sections 17.55 of both agreements state that "[a]ll

20  decisions of the arbitrators . . . shall be final and binding upon all parties."  Marzano Decl. ¶ 5,

21  Exs. A & B.  In addition, "[n]o decision of an Area Arbitrator, interim or formal, can be appealed

22  unless it is observed and/or implemented."  Marzano Decl. ¶ 5; Agreement § 17.57.  The Joint

23  Coast Labor Relations Committee may hear appeals from an Area Arbitrator's decision, and the

24  Coast Arbitrator may hear appeals from the Joint Coast Labor Relations Committee.  Agreement

25  §§ 17.261, 17.27.  The Coast Arbitrator's decisions are "final and conclusive."  Agreement

26  § 17.27.

27        If a grievance or dispute occurs "on the job," the Agreement provides for informal hearings

28  before the Area Arbitrator, who may then issue an interim ruling, which is binding on the parties.

Agreement § 17.6.  Under Section 11.43, the Area Arbitrator can be "called to the job for an immediate ruling" on disputes regarding health and safety conditions.

The union workers' jobs are assigned, or "dispatched," daily out of a hall jointly operated by the Locals and PMA.  Farley Decl. ¶ 26; Ferris Decl. ¶ 10.  Workers often work for different employers on different days and may choose not to work at all on a particular day by not appearing at the hall without suffering any penalty.  Farley Decl. ¶¶ 26-27; Ferris Decl. ¶¶ 10-11.  Depending on seniority, skills, and the number of jobs, clerks can choose which job they want to take on a given day.  Farley Decl. ¶ 28.  There are two shifts per day.  Employers will order a certain number of jobs from the Locals each day, and workers will call the "dispatch tape"—a telephonic recording—before the start of each shift to learn how many jobs are available, what type of jobs there are, and where to go.  Farley Decl. ¶ 45.  If a worker decides to work, he will go to the dispatch hall.  Farley Decl. ¶¶ 26-27.  Section 8.51 of the agreements requires each dispatching hall to "furnish on any day required up to at least the agreed number of gangs and supporting men."  Agreement § 8.51.  Among the terminals at the Port of Oakland, "SSA is one of the least popular places to work."  Farley Decl. ¶ 29.

The ILWU and PMA have a process for bringing new workers into the industry, but the union requires the employers' agreement to do so.  Villegiante Decl. ¶ 7.  "The employers have consistently either refused to register workers or agreed to register many fewer than [ILWU] need[s]."  Villegiante Decl. ¶ 7.  "Having a shortage of registered workers creates problems for Local 10 and for the industry when it comes to filling jobs."  Villegiante Decl. ¶ 8.  "Because it saves them money, the employers typically like to ensure that there are more marine clerk jobs available on a regular basis than there are registered marine clerks.  Having a constant shortage of registered marine clerks creates problems for Local 34 because it cannot fill all of the clerk jobs that employers have ordered.  Farley Decl. ¶ 22.

## II.    PROTESTS AT THE PORT OF OAKLAND

Independent commercial truckers, who are not members of ILWU or Locals 10 or 34, transport goods that arrive and are loaded or unloaded at Port of Oakland terminals.  Marzano Decl. ¶ 6.  Many of them are part of a group called the Port of Oakland Truckers Association

4

("POTA").  Marzano Decl. ¶ 7.  POTA has publicly complained that new and stricter California air pollution regulations that require the truckers to limit the amount of pollution their trucks emit are too costly and burdensome for them and has organized periodic protests at the Port of Oakland since at least the summer of 2013.  Marzano Decl. ¶¶ 7-8.  During the protests, the truckers will block or slow traffic attempting to enter and leave the Terminals, including by blocking intersections with people or trucks.  Marzano Decl. ¶ 8.  The "Occupy Oakland" movement is involved in these protests as well.  Marzano Decl. ¶ 9.

On August 19, 2013, truckers protested at the Port of Oakland, carrying picket signs criticizing the new air pollution regulations and blocking trucks attempting to enter or leave the Port.  Robinson Decl. ¶ 5.  PMA member companies ordered longshore and clerk labor for the first shift that day, but "almost none of the longshore or clerk labor" reported to work as ordered and the terminals "were almost brought to a standstill."  Robinson Decl. ¶ 5.  The labor stoppage occurred again the next day.  Robinson Decl. ¶ 5.  PMA sought relief under the agreements from Locals 10 and 34 and, after many discussions and meetings, "Local 10 and 34 reported to work."  Robinson Decl. ¶ 5.

At some point in October when the truckers put up picket lines at the Port, Local 34 President Sean Farley spoke directly with POTA members who were protesting.  Farley Decl. ¶ 36.  Farley complained that their tactics were causing problems for the unions, the employers, the Port, and the city.  Farley Decl. ¶ 36.  In exchange for their removing their pickets, Farley offered and arranged a meeting between the POTA representatives and the mayor of Oakland.  Farley Decl. ¶ 36.  POTA agreed and removed the pickets.  Farley Decl. ¶ 37.  Farley called PMA representative Bill Bartelson and encouraged him to attend the meeting with the mayor, thinking that it would be constructive for him to be present.  Farley Decl. ¶ 38.  To Farley's knowledge, no one from PMA ever attended any of the meetings with the mayor's office, although there were other meetings Farley did not attend.  Farley Decl. ¶ 38.

On October 21, 2013, truckers staged another protest, again carrying signs criticizing the air pollution regulations and blocking trucks from entering or leaving the Terminals.  Robinson Decl. ¶ 6.  Local 10 longshoremen refused to enter the Terminals and refused to perform any work

1   on the first shift, causing the terminals to shut down operations, including the loading and

2   unloading of vessels and the moving of cargo around the container yards.  Marzano Decl. ¶ 10.

3   Local 34 clerks were working during the early morning, but by mid-morning had stopped working

4   and exited the Terminals.  Marzano Decl. ¶ 11.

5   **III.      OCTOBER 21, 2013, GRIEVANCE PROCEEDINGS AND COURT ORDER**

6           Because of the refusal to work, PMA filed a grievance against Local 10, alleging that it

7   engaged in a work stoppage in violation of Section 11.  Marzano Decl. ¶ 13.  Terry Lane, the Area

8   Arbitrator, conducted a hearing at 9:05 a.m., at which PMA and Local 10 presented evidence and

9   argument.  Marzano Decl. ¶ 13.  Lane also observed the gate area at each of the terminals before

10  issuing Interim Decision NCAA-0060-2013, in which he found that "[t]rucks with containers were

11  entering the gates at Ports America Outer Harbor and Seaside Transportation Services,"

12  "protestors were positioned away from the gates and police were present both on foot and in

13  vehicles," and "[t]he demeanor of the police and protestors was non-threatening."  Marzano Decl.

14  Ex. D at 2.  Lane decided that:  (1) "Longshoremen shall enter the terminal and go to work as

15  ordered by the employer"; (2) "There was no immediate threat to the health and safety of

16  longshoremen due to the presence of protestors or police at the gate"; (3) "There was no standby

17  time payable"; and (4) "This was a bona fide health and safety dispute."  Marzano Decl. Ex. D at

18  2.

19          Local 10 did not abide by the arbitrator's decision and continued the work stoppage

20  "during the first shift."  Marzano Decl. ¶ 14.  PMA returned to Arbitrator Lane, who conducted a

21  second hearing at 11:00 a.m. Lane issued Interim Decision NCAA-0061-2013, which decided the

22  following:  (1) Local 10, its officials, and its members "are guilty of a violation of Section 17.57

23  for failing to implement Interim Decision NCAA-0060-2013"; (2) they are in violation of Section

24  11.1 by not working on four vessels and the yard at Oakland International Container Terminal; (3)

25  they are ordered to cease and desist from failing to implement the Interim Decision; and (4) "[t]he

26  evidence is that the local grievance machinery has failed to work to resolve this dispute as defined

27  in Section 17.282."  Marzano Decl. Ex. E.

28          PMA also filed a grievance against Local 34, alleging that it was engaging in a work

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    stoppage in violation of Section 11.  Marzano Decl. ¶ 15.  Arbitrator Lane held a hearing at 11:50

2    a.m.  Marzano Decl. ¶ 15.  Lane issued Interim Decision NCAA-0062-2013, which concluded that

3    (1) the protestors were "not a legitimate and bona fide picket line meeting the requirements of

4    Section 11.51"; and (2) Local 34, its officials, and its members are guilty of a violation of Section

5    11.1 for stopping work.  Farley Decl. Ex. B; Marzano Decl. Ex. F.

6           At 3:00 p.m. that day, the Joint Coast Labor Relations Committee affirmed the Area

7    Arbitrator's interim decisions through the minutes of Meeting No. 22-13.  Derris Decl. Ex. D;

8    Marzano Decl. ¶ 16.  It found that the Area Arbitrator's awards were not complied with, that the

9    Locals are required to secure conformance to the awards, that the independent truckers' protests

10   are not bona-fide picket lines under Section 11.51 of the PCL&CA and shall not be honored by the

11   ILWU workforce, and that to honor such demonstrations is a violation of Section 11.1 of the

12   PCL&CA.  Derris Decl. Ex. D; Marzano Decl. Ex. G.

13          After the confirmation, Local 34 officers told its members that they were ordered to go to

14   work; the members complied and went to work on the second shift.  Farley Decl. ¶ 34.  Local 10

15   also prepared to go back to work.  Villegiante Decl. ¶¶ 10-11.  Farley and other Local officers

16   "personally escorted" members past the protestors, who yelled at the workers.  Protestors shouted

17   insults at the Locals' members, surrounded cars, and refused to take down their pickets.

18   Villegiante Decl. ¶¶ 11-12.  Nonetheless, Local 10's workers returned to work for the second shift

19   and filled all of the jobs on that shift.  Villegiante Decl. ¶ 13.

20          After the protest, POTA posted an article entitled "Truckers, Supporters, ILWU Combine

21   To Stop Port Activity."  Marzano Decl. ¶ 12, Ex. C.  Richard Marzano, Coast Director of Contract

22   Administration and Arbitration for PMA, states on information and belief that "the ILWU and

23   Defendants Local 10 and 34 have been supporting the independent truckers in their protests at the

24   Ports of Oakland and that the independent truckers went to a Local 10 'stop work meeting' and

25   asked it to support their strike."  Marzano Decl. ¶ 12.  Further, he states on information and belief

26   that "current or former officers of Local 10 attended an independent truckers meeting on Friday,

27   August 18, 2013 to support the truckers' strike."  Marzano Decl. ¶ 12.  He does not state the basis

28   for his beliefs.

The work stoppages "resulted in significant delays and costs to the customers of PMA's members." Marzano Decl. ¶ 17. "Under the PCLCA and PCCCD, the employers may not directly recover money damages from the ILWU or its locals as a direct result of a concerted work stoppage in violation of Section 11." Marzano Decl. ¶ 18. "As a result of the work stoppage, cargo was sitting idle on vessels docked at the port or in the terminal yard." Marzano Decl. ¶ 19. The work stoppage caused a nearly complete shutdown of several PMA member companies' operations. Marzano Decl. ¶ 19. Vessels were backed up at the port, customers were not receiving products, and frozen or refrigerated cargo was at risk of perishing. Marzano Decl. ¶ 20.

The protests continued into October 22, 2013, again with protestors yelling at the workers, but Local 10 filled all of the jobs that day. Villegiante Decl. ¶ 14. That same day, PMA filed this action and asked that the Court confirm the arbitration awards. Dkt. No. 1.

On October 25, 2013, the parties submitted a stipulation in which the Locals agreed with PMA that they were bound by the arbitration rulings. The Court granted the parties' stipulated dismissal with prejudice and ordered that the ruling in Joint Coast Labor Relations Committee Meeting 22-13 be confirmed and enforced. Dkt. No. 14. The Court then dismissed the case.

## IV. NOVEMBER 27, 2013, PROTEST

PMA says that the defendants did not violate the Court's Order until November 27, 2013. Marzano Decl. ¶ 30. The parties' conduct leading up to that date is instructive, particularly concerning whether the defendants took all reasonable steps within their power to comply with the Order.

After the Court issued its Order, the truckers continued periodic protesting at the Port of Oakland. Marzano Decl. ¶ 30. On approximately November 14th or 15th, Farley met with POTA representatives and told them that he and Local 34 would not honor their picket lines. Farley Decl. ¶ 39. Several POTA members contacted him a few days later and said that they were contemplating putting up another picket line and trying to shut down the Port. Farley Decl. ¶ 40. Farley urged them not to do so and reiterated that Local 34 would not honor the picket line. Farley Decl. ¶ 40. He encouraged POTA to keep negotiating instead. Farley Decl. ¶ 40.

After that meeting, Farley called David Robinson, Labor Relations Administrator for

United States District Court
Northern District of California

PMA, and Bartelson of PMA and told them about his discussions with POTA.  Farley Decl. ¶ 41.
Farley told them that he would instruct his members to go to work and that if there was a health or
safety issue, the members should call him or another officer immediately.  Farley Decl. ¶ 41.
Farley asked Robinson and Bartelson if there was anything else they wanted him to say to Local
34's members and they responded no.  Farley Decl. ¶ 41.

About a day after speaking with PMA, Farley learned that POTA decided to put up a
picket line at the Port on November 27th.  Farley Decl. ¶ 42.  He called all the Chief Supervisors
of Local 34 (of which there are about 10)—marine clerks who oversee clerk supervisors who, in
turn, supervise all other clerks—and told them to tell members that he expected the clerks to go to
work despite any protest, but that the clerks should call him or another officer immediately if there
was a health or safety issue.  Farley Decl. ¶ 43.  Having Chief Supervisors disseminate a message
is a typical and rapid way of disseminating information.  Farley Decl. ¶ 43.  Farley himself relayed
the same message to at least 20 to 25 members in the following days.  Farley Decl. ¶ 43.  Farley
also instructed the Chief and Assistant Chief Dispatcher, who manage the dispatch tape, to tell
members that they were to work despite any protest.  Farley Decl. ¶ 44.

At some point in November, Local 10 also learned that the truckers and others were
planning another protest for November 27, 2013, and that the protestors wanted to shut down the
Port of Oakland's operations.  Ferris Decl. ¶ 33; Opp'n 8.

On November 26, 2013, the Joint Port Labor Relations Committee held a regularly-
scheduled meeting, where representatives of the Locals and PMA attended.  Ferris Decl. ¶ 32.
Among the many other topics on the agenda, Local 10 representatives told PMA about the protests
but said that Local 10 would comply with the arbitration ruling and the Court's Order.  Ferris
Decl. ¶¶ 33, 37.  Local 10's officers also expressed concerns about their members' safety.
Believing that Occupy Oakland was behind the planned protest, they reminded PMA about
massive protests by the Occupy Oakland movement in 2011 that shut down the Port.  Ferris Decl.
¶¶ 33, 34.  They also reminded PMA of a 2003 protest at the Port against the Iraq War, when
policemen mistook Local 10 members as protestors and shot at them.  Ferris Decl. ¶ 35; Br. 9.
Local 10 assured PMA that it would comply with the rulings and the Court's Order, but said that if

United States District Court
Northern District of California

1   there were health or safety risks the next day, Local 10 would address them at that time.  Ferris

2   Decl. ¶ 37; Villegiante Decl. ¶ 15.

3       Local 10 stated that it would place a recording on the dispatch tape saying that its members

4   needed to go to work as long as they could safely do so and that they could not honor the picket

5   line.  Ferris Decl. ¶ 38; Villegiante Decl. ¶ 16.  Local 10 also told PMA that it would make the

6   same announcement at the dispatch hall.  Ferris Decl. ¶ 38.  PMA representatives did not say that

7   this was insufficient or ask Local 10 to do anything more.  Ferris Decl. ¶ 38.

8       On November 26, 2013, "PMA learned that Local 10 and its members likely would

9   'honor' trucker protests and demonstrations" planned for the next day and not report to work.  On

10  the same day, PMA sent a letter to Local 10 officials reminding them of the Court's Order and

11  warning that it would seek relief if Local 10 observed the picket line.  Marzano Decl. ¶ 26, Ex. J.

12  PMA's letter allegedly states that it is responding to a November 26, 2013, letter from Local 10

13  "stating the Union's intent to observe trucker picket lines at the Port of Oakland tomorrow."

14  Marzano Decl. Ex. J.  (PMA has not provided any such letter from Local 10 with its briefing.)

15      That same day, Local 10 responded to PMA by letter:  "We want to make it absolutely

16  clear:  **ILWU Local 10 intends to comply with the October 21, 2013 CLRC minutes**

17  **(MEETING No. 22-13) and with the court's order.**  ILWU Local 10 officers are instructing

18  members to comply with these rulings and will continue to do so."  Marzano Decl. Ex. K (original

19  emphasis).  However, Local 10 expressed deep concern that the employers were "ignoring the

20  serious health and safety risks" that Local 10 members might face by going to work.  Local 10

21  recognized that the protests were first initiated by truckers, but understood that the Occupy

22  Oakland movement was now a "driving force[ ]."  Given the mass protests Occupy Oakland had

23  staged in the past and its apparent intention to shuttle in protestors, Local 10 "repeatedly asked the

24  Employers . . . [by] what measures they intend to keep [Local 10's] members safe," but the

25  employers offered no response.  Local 10 again noted the 2003 incident at which its members

26  were shot by Oakland police when they were mistaken for protestors, and said that neither the

27  arbitration decision nor the Court's Order required Local 10 members to put themselves in harm's

28  way.

10

United States District Court
Northern District of California

1    At 6:00 a.m. on November 27th at the hall, Local 10 reminded the workers of the

2    arbitration rulings and the Court's Order, and said that the workers needed to go to work and could

3    not honor the picket line.  Ferris Decl. ¶ 40; Villegiante Decl. ¶ 18.  The same announcement was

4    made half an hour later.  Ferris Decl. ¶ 41; Villegiante Decl. ¶18.

5    Local 10 claims that the employers ordered a large amount of labor from Local 10 for that

6    day:  299 jobs, 95 of which were at SSA.  Villegiante Decl. ¶ 25.  In addition, 26 clerks jobs that

7    were not filled by Local 34 were sent to Local 10 for dispatch, bringing the total number of jobs

8    ordered to 325.  Villegiante Decl. ¶ 25.  Despite it being the day before Thanksgiving, Local 10

9    filled 280 of the 325 jobs ordered for the first shift and all the jobs ordered for the second shift.

10   Villegiante Decl. ¶ 25.  PMA claims that because only about 50 of the 95 workers that SSA

11   ordered showed up, the number missing was "extraordinarily high" compared to the pattern during

12   the previous four months in which there were never more than six unfilled jobs on any given day.

13   Robinson Decl. ¶ 13.  PMA disputes that the number of jobs ordered was unusual.  According to

14   PMA, at SSA only two gangs appeared, not the eight ordered, and only one ship was worked on,

15   not the four originally planned.  Robinson Decl. ¶ 7.

16   On holiday weeks, Local 34 has trouble filling all jobs requested.  Farley Decl. ¶ 25.  This

17   is especially true on Thanksgiving week, when Local 34 also had trouble filling up job orders.

18   Farley Decl. ¶ 25.  Nonetheless, Local 34 workers went to work.  The employers ordered 126 jobs,

19   of which Local 34 filled 90.  Farley Decl. ¶ 50.  Farley claims that this is not unusual given the

20   chronic shortage of registered marine clerks.  Farley Decl. ¶ 50.  Over the last few months, Local

21   34 has been unable to fill at least 25-30 jobs regularly.  On Fridays and before holidays, it is not

22   unusual for Local 34 to be unable to fill 40 jobs or more.  Farley Decl. ¶ 50.  The fact that it was

23   the day before Thanksgiving contributed to the shortage.  Farley Decl. ¶ 50.

24   On the day of the protest, Farley called Robinson of PMA to see if there were any

25   problems.  Farley Decl. ¶ 48.  Robinson said that he was at the SSA terminal, where the protest

26   was centered.  Robinson Decl. ¶ 7.  Robinson saw members of Locals 10 and 34 arriving at and

27   entering the SSA Terminal.  Robinson Supp. Decl. ¶ 2.  Farley asked if there were any police or

28   any issues with "getting the truckers out of the way."  Robinson said no.  Farley then told

11

1   Robinson to call him or the Local 34 vice president, who was at the Port, if there were any

2   problems.  Farley Decl. ¶ 48.  Robinson did not call Farley back that day.  Farley Decl. ¶ 49.

3   PMA did not file a complaint against Local 34.  Farley Decl. ¶ 49.

4        Concerned that there would be problems, Local 10 officers went to the Port after most of

5   the workers had been dispatched.  Ferris Decl. ¶ 43; Villegiante Decl. ¶ 20.  There were many

6   policemen and protestors at the Port.  Ferris Decl. ¶ 45; Villegiante Decl. ¶¶ 20, 21.  The officers

7   received a call about an issue at Berth 55, which is part of the SSA terminal, and went there.

8   Villegiante Decl. ¶ 21.  About a dozen members were being harassed by protestors.  Ferris Decl.

9   ¶ 45; Villegiante Decl. ¶ 22.  The officers spoke with the protestors and got them to desist.  Ferris

10  Decl. ¶ 45; Villegiante Decl. ¶ 22.  The officers did not see any Local 10 members honoring the

11  picket line or refusing to go to work.  Ferris Decl. ¶ 46; Villegiante Decl. ¶ 20.

12       While at Berth 55, Local 10 President Michael Villegiante asked Dave Robinson of PMA

13  whether PMA was going to file a complaint against Local 10 under Section 8 of the PCLCD,

14  which requires the dispatching hall to provide at least the agreed number of workers ordered,

15  because PMA had done so in the past.  Villegiante Decl. ¶ 23.  Robinson said no and that he was

16  leaving.  Robinson acknowledged that the Local 10 officers were making efforts to get workers to

17  their jobs.  Villegiante Decl. ¶ 23.  The Local 10 officers checked all of the other terminals and

18  confirmed that all Local 10 members were working and that there were no protestors.  Ferris Decl.

19  ¶ 46; Villegiante Decl. ¶ 24.

20       While they were leaving, the Local 10 officers ran into several PMA and SSA

21  representatives, including Dave Robinson again.  Ferris Decl. ¶ 47; Villegiante Decl. ¶ 24.  No one

22  complained about Local 10's actions and the conversation was jovial.  Ferris Decl. ¶ 47;

23  Villegiante Decl. ¶ 24.  In particular, the SSA representative, Jacques Lira, did not say that he had

24  any problem with Local 10's actions.  Ferris Decl. ¶ 47.  Edwin Ferris, Secretary-Treasurer of

25  Local 10, asked Robinson if everything was fine, and says that Robinson said he thought so;

26  Robinson also thanked Local 10's officers for their efforts.  Ferris Decl. ¶ 48.

27       Later in the morning, Relief Area Arbitrator Joe Lucas called Local 10 Business Agent

28  Frank Gaskin (it is not unusual for arbitrators to call ILWU or PMA representatives directly,

United States District Court
Northern District of California

12

1    especially about work stoppages).  Gaskin Decl. ¶ 13.  Lucas told Gaskin that PMA had contacted

2    him earlier and asked him to be on stand-by in case PMA needed him to rule on a possible work

3    stoppage.  Gaskin Decl. ¶ 14.  Lucas also said that he had talked to someone from PMA about

4    Local 10's actions; he thanked the officers and Local 10 for going to work despite the protest.

5    Gaskin Decl. ¶ 14.  He said, "You did a good job."  Gaskin Decl. ¶ 14.

6           A newspaper article reported that about 50 police officers were present at the protest.

7    Police arrested, cited, and released individuals.  At least two people were injured when cars

8    crossing the picket line ran over their feet, including a police officer.  The article states, "Part of

9    the independent truckers' action was not as effective as planned.  Members of the International

10   Longshore & Warehouse Union, Local 10, crossed the picket line terminal.  POTA was

11   disappointed that Local 10 didn't honor the picket lines.  It was a surprising response from Local

12   10, which has historically honored picket lines in support of progressive struggles.  It was

13   particularly surprising, since Local 10's membership meeting had voted to honor all POTA picket

14   lines. . . . Members of Local 10 said that the telephone recording they call daily instructed

15   members to go to work at the SSA terminal."  Marzano Decl. Ex. I.

16          On the day of the protest, no PMA representative complained to any ILWU representative

17   about the labor shortage or any violation of the arbitration ruling or the Court's order.  Farley

18   Decl. ¶ 49; Ferris Decl. ¶ 51; Gaskin Decl. ¶ 12; Villegiante Decl. ¶ 27.[1]  After November 27th,

19   PMA never told the Locals that they had supposedly violated the arbitration ruling or the Court's

20   Order.  Farley Decl. ¶ 49.  Neither PMA nor SSA has made a complaint against Local 10 under

21   the grievance process.  Farley Decl. ¶ 49; Ferris Decl. ¶ 51; Gaskin Decl. ¶ 12; Villegiante Decl.

22   ¶ 27.  There is no evidence that PMA complained to the Area Arbitrator on or since November 27.

23          On December 10, 2013, PMA filed this motion for contempt.  After Farley learned from

24   his lawyer that PMA had filed the motion, he was furious and called Dave Robinson from PMA.

25   Farley claims to have said, "You know we did everything to comply.  You saw Dave [Hill, Local

26

27   _____

     [1] At oral argument, counsel for PMA stated that PMA did complain to ILWU on Nobember 27,
28   2013, but was unable to provide a citation for that assertion.  There is no evidence of this fact in
     the briefs or declarations filed by PMA.

United States District Court
Northern District of California

13

1  34's Vice President] telling people to go to work."  Robinson allegedly agreed.  Farley Decl. ¶ 51.

2  Robinson does not dispute this allegation in his supplemental declaration.  Dkt. No. 22-1.

3                                          **LEGAL STANDARD**

4          A court may "exercise[ ] its enforcement power . . . in contempt proceedings for violation

5  of a court order approving [a] settlement."  *TNT Mktg., Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir.

6  1986); *Seven Arts Pictures PLC v. Jonesfilm*, 311 F. App'x 962, 965 (9th Cir. 2009).  "Civil

7  contempt is characterized by the court's desire to compel obedience to a court order, or to

8  compensate the contemnor's adversary for the injuries which result from the noncompliance."

9  *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983) (citations

10 omitted).  There are two forms of civil contempt:  compensatory and coercive.  *United States v.*

11 *Asay*, 614 F.2d 655, 659 (9th Cir. 1980).  "A contempt adjudication is plainly civil in nature when

12 the sanction imposed is wholly remedial, serves only the purposes of the complainant, and is not

13 intended as a deterrent to offenses against the public."  *Falstaff Brewing*, 702 F.2d at 778.  "While

14 civil contempt may have an incidental effect of vindicating the court's authority and criminal

15 contempt may permit an adversary to derive incidental benefit from the fact that the sanction tends

16 to prevent a repetition of the disobedience, such incidental effects do not change the primary

17 purpose of either type of contempt."  *Id.*  "[W]here [a] *fine* imposed is part compensation and part

18 punishment, the criminal feature dominates . . . ."  *Id.*

19         "Where compensation is intended, a fine is imposed, payable to the complainant.  Such

20 fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil

21 litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.  *United*

22 *States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947).  "The measure of the court's

23 power in civil contempt proceedings is determined by the requirements of full remedial relief."

24 *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949).  Civil contempt "may be imposed

25 in an ordinary civil proceeding upon notice and an opportunity to be heard."  *Int'l Union, United*

26 *Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).  "In a civil contempt action the proof

27 of the defendants' contempt must be clear and convincing . . . ."  *United States v. Powers*, 629

28 F.2d 619, 626 (9th Cir. 1980).

United States District Court
Northern District of California

1    In particular, a movant for contempt must show: "(1) that [the alleged contemnor] violated

2    the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable

3    interpretation of the order, (4) by clear and convincing evidence." *United States v. Bright*, 596

4    F.3d 683, 694 (9th Cir. 2010) (citation omitted). "Clear and convincing evidence" is evidence that

5    "could place in the ultimate factfinder an abiding conviction that the truth of its factual contentions

6    are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (citation omitted).

7    "Civil contempt in this context consists of a party's disobedience to a specific and definite court

8    order by failure to take all reasonable steps within the party's power to comply. The contempt

9    need not be willful, and there is no good faith exception to the requirement of obedience to a court

10   order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir.

11   1993) (citation and quotation marks omitted). "[I]f a defendant's action appears to be based on a

12   good faith and reasonable interpretation of (the court's order), he should not be held in contempt."

13   *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982) (citation and

14   quotation marks omitted). "[S]ubstantial compliance with the terms of a consent judgment is a

15   valid defense . . . to a finding of civil contempt . . . ." *Id.* at 891. "A party's inability to comply

16   with a judicial order [also] constitutes a defense to a charge of civil contempt." *F.T.C. v.*

17   *Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999).

18                                      **DISCUSSION**

19        The Court's Order enforces and confirms the ruling in CLRC Meeting No. 22-13. Dkt.

20   No. 14. Meeting No. 22-13 held that "the Locals are required to secure conformance to the

21   awards" by the Area Arbitrator and that the trucker protests "are not bona fide picket lines [ ] and

22   shall not be honored by the ILWU workforce." In addition, "The Union reserved its locals' right

23   to stand-by under Section 11.41 should conditions significantly change," i.e., union members

24   "shall not be required to work when in good faith they believe that to do so is to immediately

25   endanger health and safety." Agreement § 11.41. The awards held that "Longshoremen shall

26   enter the terminal and go to work as ordered by the employer," Marzano Decl. Ex. D & E, and that

27   the trucker protests "are not a legitimate and bona fide picket line meeting the requirements of

28   Section 11.51," Marzano Decl. Ex. F.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    To carry its burden on this motion to contempt, PMA must show by clear and convincing

2    evidence that the defendants did not substantially comply with the Court's Order by failing to

3    instruct its members to go to work or by honoring the truckers' picket line.  The meager evidence

4    and arguments put forward by PMA cannot even meet the lower "preponderance of the evidence"

5    standard, let alone the "clear and convincing" standard.  Based on the information before the

6    Court, the motion is without merit.

7    The evidence shows that the Locals' officers made good faith efforts to ensure that their

8    members knew that they were to obey the Court's Order, were not to honor the picket line, and

9    were to go to work as usual.  *See, e.g.*, Farley Decl. ¶¶ 43-44; Ferris Decl. ¶ 40.  For the first shift,

10   280 jobs were filled out of 325 jobs ordered (86 percent).  For the second shift, all jobs ordered

11   were filled.  Villegiante Decl. ¶ 25.  The Locals' members are free to go to the dispatch hall if they

12   wish to work on a certain day, and suffer no penalty if they do not go on any given day, so it is

13   unsurprising, despite PMA's arguments to the contrary, that not all jobs for one of the two shifts

14   were not completely filled on the day before Thanksgiving.  *See* Farley Decl. ¶¶ 26-27; Ferris

15   Decl. ¶¶ 10-11.

16   The evidence also shows that several of the Locals' officers were on-site to ensure their

17   members' compliance with the arbitration ruling and the Court Order.  *See, e.g.*, Ferris Decl. ¶ 43;

18   Villegiante Decl. ¶ 20.  The officers told protestors to stop harassing their members and ensured

19   that the members were able to go to work.  Ferris Decl. ¶ 45; Villegiante Decl. ¶ 22.  Even the

20   Area Arbitrator that PMA wanted on-call during the protest expressed appreciation for the efforts

21   the Locals made to abide by the arbitration rulings.  Gaskin Decl. ¶¶ 13-14.

22   The evidence shows that, in the days leading up to the protests, the defendants' officers

23   made clear to POTA and PMA that it would not honor the truckers' picket lines.  Marzano Decl.

24   Ex. K (submitted by PMA).  There is no documentary evidence to support PMA's contrary

25   assertion that the defendants intended to honor the picket lines except for a brief reference in a

26   news article that PMA does not even cite in its briefing.  Marzano Decl. Ex. I.  Indeed, Farley

27   from Local 34 invited PMA to have discussions with POTA at the Oakland mayor's office to

28   mediate the situation, but PMA did not attend.  Farley Decl. ¶ 39.  PMA does not dispute this.

16

United States District Court
Northern District of California

1    PMA urges the Court to ignore any facts other than what occurred at the SSA terminal, the

2    only terminal at which there were protests, during the first shift.  PMA informed Locals 10 and 34

3    that it expected all ordered jobs to be filled on November 27, 2013.  Br. 12.  It alleges that "Local

4    10 on November 26 informed PMA that, in the face of renewed trucker protests, its members

5    might not report to work on November 27th."  And it points out that only about half of the ordered

6    workers arrived.  SSA ended up working on only one of four ships, delayed the sailing of two

7    other ships by two days, and incurred about $20,000 in extra labor fees and about $50,000 in late

8    sailing and delay charges and expenses.  Br. 13 (citing Rice Decl. ¶ 15).

9    From this, PMA argues that "[t]he only possible conclusion to draw from this undisputed

10   evidence is that Defendants' members honored the truckers' protests on November 27 and treated

11   the protests as picket lines and, by doing so, directly violated this Court's Order, which prohibited

12   Defendants' 'workforce' from refusing to work in support of the trucker protests."  Reply 2.  PMA

13   argues that filling 280 out of 325 jobs (86 percent) on the *first* shift does not constitute substantial

14   compliance and is "skewed and misleading" because "the only relevant inquiry is whether

15   Defendants' members honored the only protest that was occurring, which was at the SSA

16   Terminal."  Reply 3.  45 of the 94 jobs ordered for SSA were unfilled and "it is obviously not

17   mere coincidence – this was intentional conduct on the part of the Locals' members."  "The

18   undisputed evidence demonstrates that Defendants' members clearly were refusing to work in

19   deference to the trucker protests at SSA."[2]  Reply 3.

20   _____

21   [2] PMA substitutes hyperbole and vague terms for evidence on some of the claims in this matter.  It
     argues that it is "pure fiction" "that longshore workers simply do not like to work the day before
22   Thanksgiving and that SSA had ordered an unusually large number of jobs."  Reply 4; *see also* Br.
     13 (citing Robinson Decl. ¶¶ 9, 10).  It asserts that "[t]he number of jobs ordered by SSA for the
23   SSA terminal for November 27, 2013 was *neither high nor unusual*.  An order of 95
     longshoremen is consistent with, and actually *lower* than, the number SSA has ordered for its
24   terminal on *many* other occasions.  *Oftentimes*, SSA has ordered more than 100 longshore jobs for
     the first shift at that terminal, and on those occasions, SSA *almost always* had all of the ordered
25   jobs filled.  (Robinson Decl. ¶ 9).  Notably, *in the four months prior to* November 27, SSA has
     never had more than 6 unfilled jobs, with the only exceptions being on the three specific dates in
26   August, October, and November when (not coincidentally) the truckers were protesting at the
     Terminal."  Reply 4-5 (emphases added).  PMA notes that few ordered jobs are unfilled.  Br. 14
27   (citing Robinson Decl. ¶ 11).  It says that "Defendants' arguments about the impact of
     Thanksgiving are equally specious."  Reply 5.  It cites the Robinson declaration, which says that
28
                                                          17

1    But even if the Court adopted PMA's telescoped view of the evidence, it falls well short of

2    contempt.  The Court's Order does not mandate that all jobs ordered by employers must be filled.

3    The Order prohibits honoring any trucker picket line, but PMA provides **no** evidence that any

4    worker violated the Order by honoring the picket line.  On the other hand, the Agreements provide

5    a grievance process for situations in which the Locals are unable to fill all jobs ordered.

6    Agreement § 8.51.  While PMA wanted the Area Arbitrator at hand for potential labor shortages,

7    PMA did not file a complaint under Section 8.51 with the Area Arbitrator.[3]  But PMA knows how

8    to file such a complaint if it wants to:  during the protests and refusal-to-work on October 21,

9    2013, PMA filed no less than three complaints with the Area Arbitrator and participated in three

10   separate hearings before noon, in addition to making an appeal before late afternoon to affirm the

11   three awards it won.  Marzano Decl. Exs. D, E, F & G.  It did nothing of the sort here.

12   The Court can see different conclusions being drawn than the "only possible" one PMA

13   draws.  The defendants provide ample explanations for why its workers may have fallen short

14   during the first shift.  It was the day before Thanksgiving.  Workers can choose whether to go to

15   work on a particular day or not, and are not penalized for not appearing.  SSA is one of the less

16   popular terminals at which to work.  Given that the protest was public knowledge for nearly two

17   _____

18   "[e]ven for the day before Thanksgiving, there *typically* are not unfilled jobs.  I have looked at
     historic records, and there is not an *appreciable* difference . . . ."  Reply 5 (citing Robinson Decl.

19   ¶ 11) (emphases added).  Indeed, having 45 unfilled longshore jobs "was unprecedented."  Br. 14
     (citing Robinson Decl. ¶ 13).

20

21   It is striking that PMA failed to provide any credible evidence to support these claims.  PMA
     could have submitted the historic records and the "accurate[ ]" "computer and other records"

22   Robinson allegedly "carefully reviewed," but it did not.  Robinson Decl. ¶ 8.  Similarly, it does not
     explain what is a "high" or "unusual" number of jobs ordered, or how "many other occasions" it

23   ordered "lower" numbers of jobs.  It does not explain what is significant about the "four months
     prior to November 27" as opposed to the past six or 12 months.  And it does not explain why the

24   fact that the highest numbers of jobs missed coincides with protests is inconsistent with the
     defendants' claims that their members have safety concerns on the days of protests or may prefer

25   not to work on days when they might reasonably think that they would be blocked from working.

26

27   [3] At the hearing on this motion, PMA's counsel asserted that the Area Arbitrator would not be able
     to adjudge whether the Court's Order was violated.  Regardless, PMA does not dispute that it
     requested that the Area Arbitrator be ready on November 27, 2013, to resolve any dispute, which

28   is why PMA requested that the Arbitrator be on call.  PMA made no complaints to the Arbitrator
     that day.

1    weeks, it is possible that some workers did not want to deal with trying to pass through the protest

2    on that particular day—a far cry from "honoring" a picket line.

3          On the other hand, PMA—whose burden is to show contempt by clear and convincing

4    evidence—leaves many questions unanswered.  It does not explain why it was silent on and after

5    November 27th about the purported problems that day until it filed this motion nearly two weeks

6    later on December 10, 2013.  It does not explain why it did not accept the defendants' repeated

7    invitations to call them if any problems occurred on November 27th.  It does not dispute the

8    defendants' claims that they repeatedly expressed that they would not honor the picket lines and

9    made multiple efforts to ensure their members' compliance—the heart of the Order's

10   requirements.  It does not dispute any of the appreciative comments that the defendants allege

11   PMA's officers made to the defendants.  It does not dispute that the Area Arbitrator, who was on-

12   call at PMA's request, was apparently pleased with the defendants' actions.  It does not dispute

13   that defendants were criticized by POTA for not honoring the picket lines.  It does not identify any

14   additional steps that the defendants could have taken to fill all of SSA's requested jobs on the first

15   shift.  Against the underwhelming evidence put forward by PMA, the defendants seem to have

16   shown by clear and convincing evidence that they did *not* violate the Court's Order.

17         At the hearing on the motion, PMA argued that even if the defendants' officers made

18   efforts to ensure that their workers went to work, if the workers failed to do so, the defendants

19   should nonetheless be held liable because the Locals can only act through their members.  That

20   argument is meritless.  PMA cites to no authority that the Court may hold the defendants liable for

21   their line members' actions even though the defendants' officials appear to have "take[n] all

22   reasonable steps within [their] power to comply," which is a defense against contempt.  *In re*

23   *Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695.  Moreover, PMA puts the cart

24   before the horse.  Despite the fact that 45 workers did not appear at the SSA terminal, PMA has

25   not shown that any workers were honoring the picket line, which is what the Order prohibits.

26         On the basis of one quotation from a video posted online, in which "Jorge Esperanza, a

27   leader of POTA," allegedly said to Ed Henderson, a Local 10 Business Agent, "We went to your

28   hall and you promised to help us," PMA asserts that "Defendants' arguments ignore the

United States District Court
Northern District of California

19

1    undisputed evidence that, prior to the November 27 protest, the truckers visited Defendants' union

2    hall facilities and were promised support by Defendants' members."  Reply 5 (citing Cuffe Decl.

3    ¶ 3); *see also* Video:  Tempers flare during a protest at the port of Oakland, Truckers protest

4    pollution regulations at Port of Oakland, INSIDE BAY AREA NEWS (Nov. 27, 2013),

5    http://www.insidebayarea.com/news/ci_24611553/truckers-protesting-rising-costs-at-port-oakland

6    (last viewed Jan. 15, 2014).  Unfortunately for PMA, Henderson shot back at Esperanza on the

7    video, "I didn't promise a damn thing"—a critical fact that PMA omits from its briefing and Mike

8    Cuffee, Regional Manager of Yusen Terminals, mischaracterizes as "Mr. Henderson said that he

9    didn't remember."  Furthermore, while PMA argues that "[t]he undisputed evidence demonstrates

10   that Defendants' members clearly were refusing to work in deference to the trucker protests at

11   SSA," Reply 3, such an assertion is strongly discredited by the seeming hostility on the video

12   between Henderson and Esperanza, who accused the Locals of failing to support the protests.

13            PMA says that "Defendants argue that PMA's Labor Relations Administrator David

14   Robinson made certain comments on November 27 to the effect that PMA had no issues or

15   concerns with the number of jobs left unfilled at the SSA Terminal.  Nothing could be further

16   from the truth."  Reply 5.  Rather, PMA claims that Robinson only commented "that it appeared

17   that some of the longshore workers (and the clerks) were entering the terminal.  [He] did not state

18   that 'everyone' had reported to work or that all of the ordered jobs had been filled."  Robinson

19   Supp. Decl. ¶ 4.  To be sure, Robinson says in his supplemental declaration that he did not say that

20   "PMA would not take any action based upon events occurring on that day."  But the defendants

21   only claim that they heard Robinson say that PMA would not file a complaint.  Farley Decl. ¶ 49;

22   Villegiante Decl. ¶ 23.  Robinson's supplemental assertion that he never said that PMA would not

23   take *any* action is not inconsistent with the claim the defendants make.

24            More to the point, Robinson's supplemental declaration—the only one PMA submits with

25   its reply brief—does not dispute many of the other facts asserted by the defendants.  He does not

26   dispute that they invited him to call them if any problems arose but did not.  Farley Decl. ¶¶ 48-49.

27   This would have addressed his objection that he did not know until after he left SSA that many

28   jobs were unfulfilled.  He does not dispute that he thanked the defendants' officers for their

20

United States District Court
Northern District of California

1    efforts.  Ferris Decl. ¶ 48.  He does not dispute that PMA never complained to the defendants later

2    and never initiated the grievance process which they adeptly invoked just one month prior.  Farley

3    Decl. ¶ 49.

4              Unlike PMA, the defendants provide more than ample evidence to show that they made

5    good faith efforts to abide by the Court's Order.  Immediately after the CLRC ruling and before

6    the parties' stipulation and the Court's Order confirming it, the Locals ordered their members to

7    go back to work, and the members worked the second shift of October 21st.  Farley Decl. ¶ 34;

8    Ferris Decl. ¶ 30.  PMA concedes that the defendants were in full compliance with the Court's

9    Order from its issuance on October 25, 2013, through November 26, 2013.  Marzano Decl. ¶ 30.

10   On November 27th, the Locals again instructed their members to go to work, and their members

11   passed by the protestors to do so.  Farley Decl. ¶ 50; Ferris Decl. ¶ 40.  Except for a shortage of

12   workers (1) at *one* out of multiple terminals (2) during *one* shift (3) on *one* particular day—the day

13   before a major holiday—PMA has no other complaints about the defendants.  After stating that the

14   defendants never violated the Court's Order before November 27th, PMA does not allege that the

15   defendants have violated the Court's Order after November 27th or that it has filed any grievance

16   pursuant to the Agreements since then.

17            Having considered all the evidence presented, the Court concludes that PMA fails to carry

18   its burden and that contempt is unwarranted.

19                                              **CONCLUSION**

20            The Court expects that its orders will be complied with and will deal strictly with parties

21   that do not.  But it also expects that a party making the serious charge of contempt will have clear

22   and convincing evidence to support it.  There is no evidence before the Court that, prior to filing

23   this motion for contempt, PMA complained that the defendants' strategies to address the

24   November 27th protests were insufficient or that their conduct on November 27th violated the

25   parties' Agreement or the Court's Order.  PMA fails to show by a preponderance of the evidence,

26   let alone clear and convincing evidence, as is required, that the defendants violated and did not

27   substantially comply with the Court's Order.  *Bright*, 596 F.3d at 694 (9th Cir. 2010).  On the

28   other hand, the defendants presented credible evidence that they took serious efforts to comply

1    with the Court's Order—evidence that PMA did not even attempt to rebut.  The motion for

2    contempt is DENIED.[4]

3         **IT IS SO ORDERED.**

4    Dated: January 17, 2014

5    _____

6    WILLIAM H. ORRICK
     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

_____

[4] In their opposition brief, the defendants ask in the alternative that the Court refer the matter back to the Agreements' internal grievance process to determine whether they complied with the arbitration ruling.  Opp'n 1.  Because the Court finds that PMA fails its burden here, there is no need to address the defendants' alternative argument.